[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
The plaintiff brings this action in three counts basically attempting to recover from its employee, Charles M. Burke, the sum of $31,403, which it claims he received as commissions in 1999 to which he was not entitled. The first count sounds in Breach of Contract, the second count Unjust Enrichment and the third count Recovery of Loan. The identical fact pattern is the basis for all three counts. There is little dispute as to the facts in the case as a late amended answer admitted most facts pled. Both parties agree that this case is almost exclusively a matter of law based on an interpretation of an employment contract between the parties which is marked as exhibit A to the First Revised Complaint dated September 23, 1999. The parties agree that the court may treat that contract as a full exhibit in this case.
The plaintiff, Ogden Flight Service Group, Inc., a successor to Flight Services Group, Inc., and the individual defendant, Christopher Burke, entered into the employment agreement referred to above which governed the period January 1, 1995, through May 131, 1999, when the defendant voluntarily left the employ of the plaintiff. The defendant held the position of Charter Sales Manager. Said agreement called for an initial base salary of $45,000 per year, fringe benefits and commissions equal to 20 percent of the net gross profit of all charter activity in excess of a threshold established by the plaintiff. The clauses of the contract referencing the commission component are as follows:
 (b) Salary/Draw — The position receives a base salary of $45,000 per year, payable in twenty-six equal payments. In addition, the incumbent may request a quarterly advance of future commissions, [commonly referred to as a "Draw," see paragraph (d)], not to exceed one-quarter (1/4) of the mutually estimated commissionable activity for the year. It is mutually understood and agreed that such draws represent an advance of salary, and must be earned in the respective periods or equal amounts will be withheld from future base salary payments until the level of commissionable activity is actually earned.
(d) Commissions — Basically, FSG will pay a CT Page 8358 departmental commission equal to twenty percent [20%] of the Net Gross Profit (*) of all Charter Activity, in excess of a threshold (**) established annually by FSG, subject to the following: . . .
It is agreed that by 1998 the base salary under the contract had been increased to $60,000 yearly. On March 21, 1998, by letter from the defendant to the plaintiff, the defendant asked that his salary/commission draw be established at $130,000 with the commission portion of it, $70,000, being spread over the remaining pay periods of 1998. (See plaintiff's exhibit A.) That request was accepted by the plaintiff and remained the arrangement of the parties through the date of May 31, 1999, when the defendant left the employ of the plaintiff.
The evidence establishes that for the period January 1, 1999, through May 31, 1999, the defendant received $25,385 in base salary and at his request received advance payments from the; plaintiff which represented a draw on future commissions in the amount of $31,403. The parties further agree that the Charter Activity threshold for 1999 was established by the plaintiff at 875 million dollars and that as of May 31, 1999, the Charter Activity was $7,732,681.
The plaintiff simply argues that because the threshold was not reached by the time the defendant left his position that he was entitled to no commission for 1999, while the defendant argues that the contract provisions previously quoted entitled him to commissions because the Charter Activity was on a schedule in excess of the threshold and specifically that paragraph (b) called for commissions based on quarterly activity. The contract is silent as to what happens to commissions if either party terminates the contract during the course of the year. There is also no evidence as to when, if ever, the Charter Activity threshold was met during 1999, and the court's decision must be based on the fact that the threshold was not met by the time the defendant voluntarily left the plaintiff's employ. There is no evidence that the plaintiff was in any way involved in the defendant's decision to leave.
What is clear is that the defendant's compensation package was made up of base salary, here $60,000 for the year 1999, fringe benefits and commissions based on 20 percent of net gross profit of all Charter Activity in excess of 8.75 million dollars. Concerning those commissions, the defendant could wait until the end of the year or could request quarterly advances of future commissions which must be earned in the respective quarters or amounts from future base salary will be withheld until the commissions are actually earned. The defendant exercised that option to seek a draw on future commissions by his letter to the plaintiff dated March 23, 1998, wherein he requested and the CT Page 8359 plaintiff acquiesced to a $70,000 yearly commission draw. There is no evidence that the parties ever discussed or agreed upon a commission resolution prior to the defendant's termination of his employment.
The plaintiff, by letter to the defendant dated June 3, 1999 (plaintiff's exhibit B), immediately made demand for the return of all commissions paid in 1999. There was no evidence preferred as to exactly how the commission draw request of $70,000 was arrived at other than the fact that both sides assented to it. As was previously stated, the respective claims of the parties are based on the four corners of the agreement and the defendant has made no equitable claims.
Little evidence was presented at trial and most questions that were asked were objected to on the basis of the parole evidence rule. The court was encouraged to decide this matter solely on the agreement of the parties which it will.
In the case of Pesino v. Atlantic Bank of New York, supra, 244 Conn. 91-92 (1998), the Supreme Court of the State of Connecticut summarized the general principles governing the interpretation of contracts as follows:
 A contract must be construed to effectuate the intent of the parties, which is "determined from the language used interpreted in the light of the situation of the parties and the circumstances connected with the transaction . . . The intent of the parties is to be ascertained by a fair and reasonable construction of the written words and . . . the language used must be accorded its common, natural, and ordinary meaning and usage where it can be sensibly applied to the subject matter of the contract. . . . Where the language of the contract is clear and unambiguous, the contract is to be given effect according to its terms. A court will not torture words to import ambiguity where the ordinary meaning leaves no room for ambiguity. . . . Similarly, any ambiguity in a contract must emanate from the language used in the contract rather than from one party's subjective perception of the terms."
Lawson v. Whitey's Frame Shop, 241 Conn. 678, 686, 697 A.2d 1137
(1997). "Although ordinarily the question of contract interpretation, being a question of the parties' intent, is a question of fact . . . where there is definitive contract language, the determination of what the parties intended by their contractual commitments is a question of law." (Citations omitted; internal quotation marks omitted.) Levine v.Massey, 232 Conn. 272, 277, CT Page 8360654 A.2d 737 (1995); see Mulligan v. Rioux, 229 Conn. 716, 740,643 A.2d 1226 (1994), on remand, 38 Conn. App. 546, 662 A.2d 153 (1995);Bank of Boston Connecticut v. Schlesinger, 220 Conn. 152, 158, 595 A.2d 872
(1991) Thompson Peck, Inc. v. Harbor Marine Contracting Corp.,203 Conn. 123, 131, 523 A.2d 1266 (1987); Bead Chain Mfg. Co. v. SaxtonProducts, Inc., 183 Conn. 266, 274-75, 439 A.2d 314 (1981)
The court does not disagree with the defendant's legal position that because the plaintiff drafted the contract, therefore, it should be construed in a light most favorable to the defendant. Cialeglio v.Benedict Co., 127 Conn. 291, 293 (1940).
There is no dispute from the admitted allegations of the complaint and the agreement that the defendant had to earn commissions and that a threshold had to be exceeded before commissionable charter activity occurred. There is no question that that threshold was not met when the defendant terminated his employment and no way this court can conclude based on the evidence that it was ever met or to what extent it was exceeded. It is not disputed that the defendant employee had the right to request a draw based on future commissions, but he had no obligation to do so. It is further undisputed that the defendant did in fact request a draw against commissions for the year 1999 in the amount of $70,000 to be spread out on a quarterly basis. Query: What would be the result if the defendant had not requested a draw on future commissions, left the plaintiff's employ as here before the yearly threshold was met, and then demanded that the plaintiff pay him commissions based on his activities over the first five months? This court would conclude he was entitled to no commissions. What then is different about this case? The answer must still be found in the parties' agreement. The defendant wants the court to interpret the agreement as one creating quarterly thresholds as opposed to a yearly threshold.
Preliminarily there appears to be a difference of opinion on whether the threshold established by the plaintiff was an annual threshold. By the clear language of the agreement as shown on page 5 in the second note to paragraph (D) it states: "For the year 1995, the Charter Sales threshold has been established at 4.0 million. . . ." That specific language and all the logical inferences that can be drawn from it and the balance of the agreement lead this court to conclude that it provided for an annual threshold.
The defendant argues that he earned commission income of $31,403 for the period January 1, 1999, through June 1, 1999. There is no evidence to support that. All the court can conclude is that at his specific request CT Page 8361 he received a draw on future commissions during that period in that amount. He further argues in support of his claim that he earned commissions during this period; that because the plaintiff did not withhold income from the base salary due him during the second quarter, that he must have earned the commission in the first quarter. The problem with that argument is that the defendant left his employ before the end of the second quarter and the fact that the plaintiff had the right to withhold salary income in the third and fourth quarters to balance the commission account, which it was prevented from doing.
The defendant further argues that his department in the first five months of 1999 had already made 88 percent of the yearly threshold of 8.75 million dollars. His commissions, however, were based on 20 percent of net gross profit in excess of that figure. How can this court conclude, in the absence of any evidence, that the threshold would have been exceeded or by how much in order to calculate commission income due. There is simply no way to determine if $31,403 or any number was earned by the defendant during that period. That number was established by the defendant himself as an estimate when he asked for an advance of $70,000 against commissions for the year 1999.
What then does the agreement say. It says the defendant receives a salary of $60,000 plus fringe benefits for the year 1999 without regard to the success of his efforts. The agreement further provides that he may also earn commissions based on 20 percent of net gross profits on charter activity in excess of 8.75 million dollars. That threshold is established on an annual basis. The agreement then basically gave the defendant two options with reference to his commissions. He could wait until the end of the year to see if and by how much net gross profits exceeded the threshold and then receive one check for the earned commissions or in accordance with the agreement he could
 request a quarterly advance of future commissions [commonly referred to as a `Draw', see paragraph (D)] not to exceed one-quarter (1/4) of the mutually estimated commissionable activity for the year.
It then provided protection for the employer if the estimated commissionable activity was not met as follows:
It is mutually understood and agreed that such draws represent an advance of salary, and must be earned in the respective periods or equal amounts will be withheld from future base salary payments until the level of CT Page 8362 commissionable activity is actually earned.
Rather than establishing that these clauses somehow changed the agreement to quarterly thresholds, they merely provided for a mutually agreed upon draw on a quarterly basis and a method for the employer to recoup unearned commissions.
On page 5 of its brief, the defendant's counsel argues: In this instance, the Defendant earned commission income of $31,403 for the period January 1, 1999 through June 1, 1999, which would translate to total annual commission income of $75,000 . . . That simply cannot be supported because there is no evidence of the threshold either being met or exceeded. It had to be exceeded to support any commission due. The court simply cannot supply the necessary predicate for that. The court has no idea how the defendant arrived at the sum of $70,000 as estimated commissions or what the formula was to establish it. No evidence was offered to establish whether in this type of business heavier sales activity takes place early in the year or whether the sales activity in the early months was apt to be duplicated for the balance of the year. That whole subject remains totally speculative. The court concludes that the threshold was an annual one, it was not met when the defendant voluntarily left his employ and therefore no commission income was earned by him in 1999.
The defendant further argues that even if the court finds there were no commissions earned in 1999 there are no provisions in the agreement which expressly or impliedly require the reimbursement by the defendant to the plaintiff from his personal funds. He attempts to distinguish this from paragraph (b) of the agreement which allows the employer to reimburse itself from the plaintiff's future salary if commissionable activity is not reached. His argument would result in this totally unreasonable situation that if the defendant stayed in the plaintiff's employ for the balance of 1999 and did not achieve the threshold, the employer could reimburse itself from future salary payments to the defendant, but if the defendant leaves his employment before the end of the year and before the threshold is met he gets to keep all commissions received up to that time. That is not what the agreement states and this court will not imply such an illogical land unreasonable result.
Lastly, the defendant relies on the case of Valoco Building Products,Inc. v. George Chafee, 4 Conn. CT. 322 (1966) in support of his position. He acknowledges that that case may have limited applicability here because here there was a written agreement between the parties. That case stands for the proposition that where advances made to a salesman are charged against commissions earned, he is not required to pay any CT Page 8363 excess of advances over commissions unless it has been expressly or impliedly agreed that he do so. That case and others supporting the so-called majority rule are also distinguishable from this case because here the defendant was paid a substantial salary and fringe benefits without regard to his success. His commission income could only arise upon reaching the threshold and then applying whatever formula the parties had agreed upon. On that subject, the only evidence the court has is from the defendant who stated he has no idea how his commissions were calculated.
Lastly, the agreement has express language on reimbursement of unearned commissions. They are simply withheld from future salary payments. As has been previously stated, it is ridiculous to argue that the employee can avoid that reimbursement by quitting before the threshold supporting commissions is met.
The court finds the issues on the first count for the plaintiff and orders judgment in the amount of $31,403.
The court has reviewed the plaintiff's request for interest on the judgment and the court in its discretion is denying that request.
 ___________________ GORMLEY, JUDGE